UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

DOUGLAS MACARTHUR GUILE,

          Plaintiff,                        Case No. 1:24-cv-1252

v.                                      Honorable Jane M. Beckering

UNKNOWN GOULET et al.,

          Defendants.

_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court grants Plaintiff leave to proceed *in forma pauperis* in this action. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Clark, Hack, Cunningham, Bray, Brown, Atkins, Hawkins, Macauley, and Unknown Parties. The Court will also dismiss, for failure to state a claim, Plaintiff's due process claim against Defendant Goulet. The following claims against Defendant Goulet remain in the case: Plaintiff's First Amendment religious exercise and retaliation

claims, his Eighth Amendment excessive force claim, and his Fourteenth Amendment equal protection claim.

## Discussion

I.    **Factual Allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Saginaw County Correctional Facility (SRF) in Freeland, Saginaw County, Michigan. The events about which he complains, however, occurred at the Earnest C. Brooks Correctional Facility, (LRF) in Muskegon Heights, Muskegon County, Michigan and the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan.

Plaintiff sues LRF employees Corrections Officers Unknown Goulet, Unknown Hack, Unknown Cunningham, and Unknown Brown, Sergeant Unknown Clark, Nurse Unknown Bray, Lieutenant Unknown Atkins, Administrative Law Judge Unknown Hawkins, and Unknown Parties named as unnamed defendants. Plaintiff also sues IBC Warden Matthew Macauley. (Compl., ECF No. 1, PageID.2.)

Plaintiff alleges that he is a member of the Nation of Islam (NOI). (*Id.*) Plaintiff states that members of the Nation of Islam follow a strict dress code, which require them to have their shirts tucked in and buttoned all the way to the top, and to have their pants neatly pressed. (*Id.*) Plaintiff states that Defendant Goulet had questioned him regarding his attire on previous occasions and had also asked if Plaintiff's "kind" strapped bombs to themselves and blew up. (*Id.*, PageID.3.) Plaintiff responded that he did not care if other prisoners dressed in baggy clothes and that "we do not strap bombs to ourselves to blow up things." (*Id.*)

Plaintiff asserts that he is a fifty-three year old African American and is a chronic care patient who suffers from high blood pressure, type 2 diabetes, and high cholesterol. (*Id.*) As a result, Plaintiff takes medications which increase his need to go to the bathroom. (*Id.*) On

2

September 19, 2022, Plaintiff and a fellow NOI member were both returning from health care when Defendant Goulet stopped them and asked for a shakedown. (*Id.*) Defendant Goulet asked the two why they were walking so quickly and Plaintiff responded that he needed to use the restroom. (*Id.*, PageID.4.) Defendant Goulet stated that his "shakedown trump[ed Plaintiff's] restroom use." (*Id.*)

Plaintiff emptied his pockets and handed Defendant Goulet his address book, which was the only item he had. (*Id.*) Defendant Goulet searched the book and handed it back to Plaintiff, who placed it back in his pocket. (*Id.*) Defendant Goulet then searched Plaintiff and asked him what was in his back pocket. Plaintiff stated that it was his address book that had already been searched. (*Id.*) Defendant Goulet then asked to see the address book again and Plaintiff realized that he was being harassed, so he told Defendant Goulet that he could have the address book but that Plaintiff had to urinate and was going to the bathroom even if it meant receiving a disobeying a direct order misconduct. (*Id.*) Plaintiff attempted to walk away and Defendant Goulet grabbed his wrist, twisting it roughly. (*Id.*)

At this point, approximately five other officers ran over and grabbed Plaintiff around his neck and shoulders. (*Id.*, at PageID.5.) Defendant Goulet yelled that Plaintiff had something in his hand and in his mouth and to watch out for a weapon. (*Id.*) The officers forcibly took Plaintiff to the ground while holding his arms immobile so that Plaintiff was unable to break his fall, causing Plaintiff to strike his forehead. (*Id.*) At least two of the officers began sticking their fingers in Plaintiff's mouth trying to gag him, while the remaining officers choked Plaintiff and attempted to pry his fingers apart. (*Id.*) Plaintiff suffered a nosebleed, a knot on his forehead, a busted kneecap, a twisted ankle, a concussion, a chipped tooth, and a badly bruised body. (*Id.*) In addition, Plaintiff

suffered the humiliation of urinating on himself after an officer's knee was pressed into Plaintiff's pelvic and groin area. (*Id.*)

Plaintiff was subsequently cuffed and searched, as was the surrounding area. (*Id.*) Defendant Clark asked Defendant Goulet what he thought he had seen, and Defendant Goulet stated "I don't know, but I thought I saw something." (*Id.*) Plaintiff was ordered to segregation for a strip search and on the way, he told the officers that he felt dizzy, and his head was throbbing. Plaintiff also complained that his kneecap felt loose and asked to be taken to health care. (*Id.*)

Plaintiff was denied health care and was taken straight to segregation where he was strip searched. (*Id.*, PageID.6.) Nothing was found on Plaintiff, and he was left unattended for nearly four hours, after which he was released back into the general population. (*Id.*) Plaintiff requested medical attention, but Defendant Hack told him to submit a medical kite. (*Id.*) Plaintiff states that Defendant Hack is aware that it takes several days for a prisoner to be seen through the kite system. (*Id.*)

Plaintiff states that he reported his injuries to Defendants Hack, Clark, Cunningham, and Atkins, but none of these individuals let Plaintiff see health care. (*Id.*) On September 19 and 20 of 2022, Plaintiff's injuries were also visible. However, Defendants refused to document them by taking photographs. Nor did Defendants photograph Plaintiff's urine-stained clothing. (*Id.*) When Plaintiff was eventually seen by health care, the only treatment they rendered was an ace bandage for his knee. (*Id.*, PageID.7.)

On November 16, 2022, Plaintiff kited medical and requested a knee x-ray stating that his kneecap felt like it was dislocated. (*Id.*) Plaintiff states that the lack of response by health care to his kites made it more difficult for him to pursue legal remedies because a critical incident report was not completed. (*Id.*) However, Plaintiff attaches a copy of the kite response, which states that

he would be scheduled for an evaluation. (ECF No. 1-2, PageID.22.) Plaintiff filed another kite on December 12, 2022, while confined at the Bellamy Creek Correctional Facility (IBC).

The response to that kite states: "Previous facility had scheduled a RNR [RN referral] to MP [medical provider], prior to appointment taking place patient was transferred to current facility. Will create a replacement RNR to MP for ongoing knee concerns." (ECF No. 1, PageID.7; ECF No. 1-1, PageID.24.)

Plaintiff contends that Defendant Hawkins denied him a fair hearing when he concluded that Plaintiff appeared to "begin arguing with the officer" despite the fact that the video of the incident did not include audio. (*Id.*, PageID.8.) Plaintiff asserts that he had done nothing to justify the use of force on him and that Defendant Goulet was merely angry because Plaintiff told him that he was "not going to sit [there] and entertain" Defendant Goulet's harassment, which Plaintiff believes was prompted by his adherence to the NOI dress code. (*Id.*)

Plaintiff asserts that Defendant Hawkins has a duty under the Administrative Procedures Act (APA) to compel disclosure of documents specifically relevant to the issue before him and that his decision that witness answers were not relevant documents violated this duty. (*Id.*, PageID.9–10.)

Plaintiff states that Defendant Goulet violated the First and Eighth Amendments when he retaliated against him for dressing in accordance with his religious beliefs by harassing him and subjecting him to excessive force. (*Id.*, PageID.10–11.) Plaintiff also states that Defendants Hack, Clark, Cunningham, Atkins, Hawkins, Brown, and Bray were deliberately indifferent to his need for medical care in violation of the Eighth Amendment. (*Id.*, PageID.13–14.) Finally, Plaintiff claims that Defendant Hawkins violated his due process rights. (*Id.*, PageID.14.)

Plaintiff seeks compensatory and punitive damages, as well as injunctive relief.

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Defendants Macauley and Unknown Parties

Plaintiff fails to allege that Defendant Macauley took any action against him, other than to say that he was employed as the warden of IBC during the pertinent time period. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

7

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Plaintiff fails to allege any facts showing that Defendant Macauley encouraged or condoned the conduct of his subordinates, or authorized, approved or knowingly acquiesced in the conduct. Indeed, he fails to allege any facts at all about Defendant Macauley's conduct. Plaintiff's vague and conclusory allegations of supervisory responsibility are insufficient to demonstrate that Defendant Macauley was personally involved in any alleged misconduct. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Because Plaintiff's claims against Defendant Macauley appear to be premised on nothing more than respondeat superior liability, he fails to state a claim against Defendant Macauley.

Plaintiff names "Unknown Parties" as Defendants but does not allege any facts regarding these individuals in the body of his complaint. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's

claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries"). Because Plaintiff's claims fall far short of the minimal pleading standards under Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"), his complaint must be dismissed against Defendants Unknown Parties.

### B.      Due Process

Plaintiff claims that his due process rights were violated in relation to his misconduct conviction for assault and battery. The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest

protected by the Due Process Clause. According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).

Plaintiff's major misconduct charge and conviction affected a number of Plaintiff's interests, but none of them fall into either of the categories identified in *Sandin* as protected by due process, i.e., an inevitable effect on the duration of Plaintiff's sentence or an atypical and significant hardship. As to the first category, Plaintiff has not alleged a deprivation that will inevitably affect the duration of his sentence. A prisoner like Plaintiff, who is serving an indeterminate sentence for an offense committed after 2000[1], can accumulate "disciplinary time" for a major misconduct conviction. *See* Mich. Comp. Laws § 800.34. Disciplinary time is considered by the Michigan Parole Board when it determines whether to grant parole. *Id.* § 800.34(2). It does not necessarily affect the length of a prisoner's sentence because it is "simply a record that will be presented to the parole board to aid in its [parole] determination." *Taylor v. Lantagne*, 418 F. App'x 408, 412 (6th Cir. 2011).

As to the second category, Plaintiff has not alleged that he suffered a "significant and atypical deprivation." The hearing report, which is attached to Plaintiff's complaint, shows that Plaintiff received 14 days on top lock and 21 days loss of privileges as a result of his misconduct conviction. (ECF No. 1-1, PageID.27.) Confinement in segregation "is the sort of confinement that

---

[1] *See* MDOC Offender Tracking Information System, https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=429156 (last visited Apr. 2, 2025).

inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th Cir. 2008).

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484. Similarly, the Sixth Circuit has held that placement in administrative segregation for two months does not require the protections of due process. *See Joseph*, 410 F. App'x at 868 (61 days in segregation is not atypical and significant). It has also held, in specific circumstances, that confinement in segregation for a much longer period of time does not implicate a liberty interest. *See, e.g.*, *Jones*, 155 F.3d at 812–13 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). Generally, only periods of segregation lasting for several years or more have been found to be atypical and significant. *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest).

Here, Plaintiff received 14 days on top lock and 21 days loss of privileges as a result of his misconduct conviction. By the terms of *Sandin* itself, the deprivations suffered by Plaintiff were

neither atypical nor significant. As noted above, the Court in *Sandin* concluded that 30 days' placement in segregation— a far more significant deprivation than top lock or loss of privileges— was not atypical and significant. Plaintiff's allegations therefore fail to implicate a liberty interest.

### A. Equal Protection

Plaintiff appears to be claiming that Defendant Goulet discriminated against him because he was a member of the NOI. The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). A law or official action that adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, implicates the Equal Protection Clause. *See City of Cleburne*, 473 U.S. at 440.  To establish a violation of the Equal Protection Clause, an inmate must show that the defendants purposefully discriminated against him. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Such discriminatory purpose must be a motivating factor in the actions of the defendants.  *Id.* at 265-66.  To show discriminatory purpose an inmate "can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011).

Plaintiff claims that Defendant Goulet targeted him for harassment, excessive force, and a false misconduct ticket solely because he was dressing in accordance with his religious beliefs as a member of the NOI. At this point in the litigation, the Court concludes that Plaintiff has alleged sufficient facts to avoid dismissal of this claim.

12

### B.  Eighth Amendment

#### 1.  Excessive Force

Plaintiff asserts that Defendant Goulet subjected him to excessive force when he attempted to walk away on September 19, 2022. (ECF No. 1, PageID.11–13.) The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981); *see also Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification." *Id.*

Generally, restrictions and even harsh conditions of confinement are not necessarily cruel and unusual punishment prohibited by the Eighth Amendment. *Rhodes*, 452 U.S. 347. The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Wilkins v. Gaddy,* 559 U.S. 34, 37–39 (2010). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7; *Wilkins*, 559 U.S. at 37. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 7 (citing *Whitley*, 475 U.S. at 321); *accord Griffin v.*

*Hardrick*, 604 F.3d 949, 953–54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990).

In this case, Plaintiff concedes that he did not comply with Defendant Goulet's order to give him his address book for a second time, and that he attempted to walk away from the area without permission during the search. Plaintiff states that instead of merely giving him a misconduct ticket for disobeying a direct order, Defendant Goulet unnecessarily escalated the situation, calling other officers to the area and falsely accusing Plaintiff of hiding an object in his hand and/or mouth. Plaintiff alleges that this caused him to be forcefully taken to the ground and injured. (ECF No. 1, PageID.4–5.)

Plaintiff specifically alleges that after he stated that he was about to "pee himself," Defendant Goulet grabbed Plaintiff's arm and twisted it, then began to "clip" his foot, slamming Plaintiff to the ground face first and pressed a knee on Plaintiff's neck, causing a concussion, dizziness, and a bloody nose, as well as injuries to Plaintiff's head, neck, knee, and ankle. (*Id.*, PageID.11–12.) During this interaction, Defendant Goulet said, "You ain't so tough." (*Id.*, PageID.11.) Plaintiff contends that as a result of this incident, he suffered a dislocated kneecap, an injured neck, a bloody nose, a swollen ankle, and a permanent knot in Plaintiff's forehead. (*Id.*, PageID.12.)

Taking the allegations in the light most favorable to Plaintiff, as the Court is required to do, the Court concludes that at this point in the litigation, Plaintiff's excessive force claim against Defendant Goulet should not be dismissed.

### 2.  Deliberate Indifference to Medical Needs

Plaintiff also claims that he was denied medical care following the use of excessive force by Defendants Hack, Clark, Cunningham, Atkins, Hawkins, Brown, and Bray. (*Id.*, PageID.13.)

14

The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g., Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be

consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted), *abrogation on other grounds recognized by Lawler as next friend of Lawler v. Hardiman Cnty., Tenn.*, 93 F.4th 919 (6th Cir. 2024).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the

conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (2014). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

Plaintiff states that he suffered a nosebleed, a knot on his forehead, a busted kneecap, a twisted ankle, a concussion, a chipped tooth, and a badly bruised body, but was denied health care and was taken straight to segregation where he was strip searched. (ECF No. 1, at PageID.5–6.) Plaintiff was left unattended for nearly four hours, after which he was released back into the general population without any medical attention. (*Id.*, PageID.6.) Plaintiff then requested medical attention, but Defendant Hack told him to submit a medical kite even though he knew that it would take several days for Plaintiff to be seen. (*Id.*)

Plaintiff reported his injuries to Defendants Hack, Clark, Cunningham, and Atkins, but none of these individuals let Plaintiff see health care despite the fact that his injuries were visible. (*Id.*) Plaintiff does not specify when he saw health care for his injuries, but in a grievance dated October 7, 2022, he asserts that he was seen on September 30, 2022, and was given an ace bandage to wear for one week, after which he was to return to health care to determine if x-rays were needed. (ECF No. 1-1, PageID.38.) Plaintiff's grievance further states that on October 7, 2022, he

went to health care, but had forgotten the ace bandage, so was sent back to his unit to retrieve it. (*Id.*) Upon returning to health care with the ace bandage, Defendant Brown told him that health care did not need to see him and that his leg was fine. (*Id.*) In the grievance, Plaintiff stated that he thought Defendant Brown was lying. (*Id.*) Plaintiff's grievance was denied at step I because Defendant Brown was merely following instructions from health care. (*Id.*, PageID.39.) Plaintiff appealed the denial of his grievance, but his appeal was denied at steps II and III. (*Id.*, PageID.40–42.) In the step II denial, the respondent LRF warden states that health care confirmed that there was no scheduled appointment or need to further assess Plaintiff's condition on October 7, 2022. (*Id.*, PageID.41.)

On November 16, 2022, Plaintiff kited medical and requested a knee x-ray stating that his kneecap felt like it was dislocated. (*Id.*) Plaintiff attaches a copy of the kite response, which states that he would be scheduled for an evaluation. (ECF No. 1-2, PageID.22.) Plaintiff filed another kite on December 12, 2022, while confined at the Bellamy Creek Correctional Facility (IBC). The response to that kite states: "Previous facility had scheduled a RNR [RN referral] to MP [medical provider], prior to appointment taking place patient was transferred to current facility. Will create a replacement RNR to MP for ongoing knee concerns." (ECF No. 1, PageID.7; ECF No. 1-1, PageID.24.)

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster*, 749 F.3d at 448; *Perez v. Oakland Cnty.*, 466

F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440–41 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Of the individuals named in Plaintiff's deliberate indifference claim, only Defendant Bray is a medical professional. Plaintiff states that he sought medical care from Defendant Bray during nurse rounds and that she merely told him that he was "on appointment to see the doctor." (ECF No. 1, PageID.7.) Plaintiff states that this appointment never occurred, but as noted above, Plaintiff states in his step I grievance that he was seen by health care on September 30, 2022. (*Id.*; ECF No. 1-1, PageID38.)

> In his complaint, Plaintiff states:
>
> Despite Plaintiff's continuous outcries to her, Defendant Nurse Bray used a facade of delays and mostly palliated Plaintiff's severity / injury level. By delaying and ignoring treatment of Plaintiff's injuries, this slowed down the tender of law. It is customary that following any situation, such as an assault on staff, a critical incident report is drawn up. Plaintiff's injuries were purposely ignored and not documented (no photographs taken of the severe injuries).

(ECF No. 1, PageID.7.) Plaintiff's allegations regarding Defendant Bray are largely conclusory. Moreover, Plaintiff's assertions about the conduct of Defendant Bray appear to be focused on the fact that she interfered with his ability to pursue a legal action. As noted above, the only treatment

received by Plaintiff once he was seen by health care was an ace bandage for his knee. Plaintiff does not allege facts showing that Defendant Bray was aware of a substantial risk of serious harm to Plaintiff and failed to act despite that knowledge. Nor does Plaintiff allege facts showing that the delay in receiving medical care caused him any further injury. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Therefore, Plaintiff's Eighth Amendment claim against Defendant Bray is properly dismissed.

As to Defendants Hack, Clark, Cunningham, Atkins, Hawkins, and Brown, Plaintiff states that in the period immediately following his injuries, they refused his request for emergency medical treatment and instructed him to submit a medical kite. Plaintiff states that they also refused to document his injuries. (ECF No. 1, PageID.6–7.) Plaintiff states that he had visible bumps and bruises at the time he was told to submit a medical kite. (*Id.*) However, Plaintiff fails to allege facts showing that he had a need for emergency medical treatment and that Defendants Hack, Clark, Cunningham, Atkins, Hawkins, and Brown were aware of such a need. Nor does Plaintiff allege facts showing that he suffered any damage as a result of having to kite for a medical appointment, rather than being seen immediately following the incident. Such facts do not rise to the level of an Eighth Amendment violation.

Finally, Plaintiff claims that on October 7, 2022, Defendant Brown told him that health care did not need to see him and that his leg was fine even though Plaintiff had yet to see a doctor or to have x-rays taken. (*Id.*, PageID.8.) However, as noted above, the step II response to Plaintiff's grievance on the matter states that health care confirmed that there was no scheduled appointment or need to further assess Plaintiff's condition on October 7, 2022. (ECF No. 1-1, PageID.41.) Administrative or custody officials who have no training or authority to supervise healthcare

officials cannot be held liable for those officials' inadequate care. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 895 (6th Cir. 2018) (custody officer entitled to rely on medical provider's judgment); *Smith v. Cnty. of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012) ("[I]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.") (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see also Newberry v. Melton*, 726 F. App'x 290, 296–97 (6th Cir. 2018) (same); *Cuco v. Fed. Med. Ctr.-Lexington*, No. 05-CV-232-KSF, 2006 WL 1635668, at *21–22 (E.D. Ky. June 9, 2006) (holding that prison administrative officials were not liable for overseeing and second-guessing care given by medical officials) (citing *Birrell*, 867 F.2d at 959).

Because Plaintiff fails to allege facts showing that Defendants Hack, Clark, Cunningham, Atkins, Hawkins, Brown, and Bray were deliberately indifferent to a substantial risk of serious harm to Plaintiff, his Eighth Amendment claims against them are properly dismissed.

## C. First Amendment

### 1. Religious Exercise

Plaintiff claims that Defendant Goulet harassed him because he dressed in compliance with the tenets of the NOI. The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. amend I. The right to freely exercise one's religion falls within the fundamental concept of liberty under the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, state legislatures and those acting on behalf of a state are "as incompetent as Congress" to interfere with the right. *Id.*

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates retain the First Amendment protection to freely exercise their

religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, Plaintiff must establish (1) that the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) that Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Plaintiff has sufficiently alleged his sincerely held religious belief that dressing in a particular manner is a tenet of the NOI religion. The next consideration is "whether the challenged practice of the prison officials infringes on the religious belief. . . ." *Kent*, 821 F.2d at 1224–25. A practice will not be considered to infringe on a prisoner's free exercise unless it "places[s] a substantial burden on the observation of a central religious belief or practice. . . ." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *see also Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015) (McKeague, J., dissenting) ("To violate the First Amendment, the diet must impose a substantial burden on the inmate's exercise of religion.").

> Courts routinely have rejected claims of constitutional violations based solely on verbal harassment. *See, e.g., Shuaib v. Siddum*, No. 88-86126, 1988 WL 86126, at *1 (6th Cir. 1988) (holding that prison officials' refusal to address prisoners by their newly adopted legal names does not violate the religion clauses of the First Amendment) (citing *Ivey v. Wilson*, 832 F.2d 950, 954-55 (6th Cir. 1987) (holding that verbal harassment is insufficient to support an Eighth Amendment claim)); *Hailes v. Collier*, No. 2:12–cv–687, 2014 WL 2515581, at *5 (S.D. Ohio June 3, 2014) (holding that verbal harassment is insufficient to state a claim under § 1983 for violation of any constitutional amendment, including the First Amendment religion clauses) (citing *Siggers v. Renner*, 37 F. App'x 138, 141 (6th Cir.2002), and *Wingo v. Tenn. Dep't of Corr.*, 499 F. App'x 453, 455 (6th Cir. 2012)); *Mizori v. Miller*, No. 5:09–cv–10824, 2009 WL 777640, at *2 (E.D. Mich. Mar. 20, 2009) (holding that verbal harassment was insufficient to support a claim of religious discrimination under the First Amendment). Especially in light of the minimal nature of the harassment alleged, Plaintiff fails to state a claim for violation of his religious rights under the First Amendment.

*Annabel v. Mich. Dep't of Corr.*, No. 1:14-cv-756, 2014 WL 4187675, at *15 (W.D. Mich. Aug. 21, 2014).

In this case, Plaintiff states that Defendant Goulet verbally harassed him on several occasions regarding his manner of dress and his membership in the NOI. However, in addition to this, Plaintiff alleges that Defendant Goulet also targeted him for an unnecessary search, used excessive force on him, and gave him a false misconduct ticket all because of his religious affiliation. The Court concludes that at this point in the litigation, such allegations are sufficient to avoid dismissal of Plaintiff's First Amendment religious exercise claim.

### 2. Retaliation

Plaintiff also claims that Defendant Goulet retaliated against him for dressing in accordance with his religious beliefs in violation of the First Amendment. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The Court concludes that Plaintiff's allegations that Defendant Goulet made comments about his manner of dress as a member of the NOI, used excessive force against him and wrote a false misconduct ticket on him are sufficient to support a retaliation claim at this point in the litigation.

### <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Clark, Hack, Cunningham, Bray, Brown, Atkins, Hawkins, Macauley, and Unknown Parties will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss, for failure to state a claim, Plaintiff's due process claim against Defendant Goulet. Plaintiff's First Amendment religious exercise and retaliation claims, his Eighth Amendment excessive force claim, and his Fourteenth Amendment equal protection claim against Defendant Goulet remain in the case.

An Order consistent with this Opinion will be entered.


Dated: _____April 18, 2025_____          /s/ Jane M. Beckering_____
                                          Jane M. Beckering
                                          United States District Judge